UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JENNA WHITE,

                               Plaintiff,

        v.                                          1:06-CV-564
                                                    (LEK/GJD)

COMMISSIONER OF SOCIAL SECURITY,

                               Defendant.

_____

THOMAS C. ERWIN, ESQ., for Plaintiff
KAREN G. FISZER, Special Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

### REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

### PROCEDURAL HISTORY

On September 9, 2003, plaintiff filed applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income benefits, claiming a disability onset date of July 22, 2003.  (Administrative Transcript ("T.") 57-59, 183-86).  Plaintiff's applications were denied initially, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  A hearing was held on November 17, 2004.  (T. 218-48).  At the hearing, plaintiff and a vocational expert testified.  *Id*.  In a decision dated January 25, 2005, the ALJ found that plaintiff was not disabled.  (T. 12-24).  The ALJ's decision became the final decision of the Commissioner when the

Appeals Council denied plaintiff's request for review on March 30, 2006. (T. 4-7). After the ALJ's decision on January 25, 2005, plaintiff's counsel submitted additional medical reports to the Appeals Council that were received and made part of the record. (T. 7). These additional medical records included reports from a new treating physician (Dr. Alpart) (T. 196-98), a new treating neurologist (Dr. Beesley) (T. 203-12), nerve conduction studies (208-12), a lumbar spine M.R.I. report, and a pain questionnaire completed by plaintiff and presented to Dr. Cooper (T. 214-18).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The Commissioner erred in finding that plaintiff's impairments did not meet or equal the level of severity of any listed impairment in Listing "12.01." (Plaintiff's Brief at 13)(Dkt. No. 9).

(2) The Commissioner's credibility determination is improper. (Plaintiff's Brief at 14-15).

(3) The Commissioner's determination that plaintiff is not disabled is not supported by substantial evidence in the record. (Plaintiff's Brief at 16-17).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed.

## FACTS

**A.  <u>Non-Medical Evidence and Testimony</u>**

Plaintiff was thirty-nine years old at the time of the ALJ's hearing and has a ninth grade education. (T. 5, 16). Plaintiff's past work experience includes work as a bartender, waitress, and short order cook. (T. 16). As a bartender, plaintiff was required to perform many physical functions. (T. 104, 105). Plaintiff testified that

her pain began while she was working as a bartender during October 2002. (T. 222). She stated that one night, she was stacking cases of beer, and when she woke up the next morning, she was unable to move. (T. 222).  Plaintiff had intense pain, and could not get out of bed or sit upright.  (T. 223).  She consulted with Dr. Craig Goldberg, a neurosurgeon, who performed surgery on November 23, 2002.  (T. 125-31).

Plaintiff testified that after her surgery, she took medications and attended physical therapy. (T. 223-24).  This resulted in temporary relief of her pain.  *Id*. She returned to work as a bartender during January 2003, but could only work two days each week because after working for one day, she experienced intense pain.  (T. 224-25).  Plaintiff stated that she used many different medications to reduce her constant daily pain.  (T. 225).  She also was given various injections by pain management physicians during the course of her therapy.  *Id*.  Plaintiff stated that she uses a heating pad almost every day and uses ice if she exerts herself too much. (T. 226). She stated that she spends approximately 75 to 80 percent of her waking hours lying down because that is the only way she is comfortable.  (T. 226).  She stated that she could only walk approximately fifty yards and never goes out without her cane.  (T. 226-27).

According to plaintiff, she cannot drive more than ten miles because her leg becomes numb. (T. 228).  She is able to stand for approximately fifteen to twenty minutes, but after that she experiences a lot of throbbing and pain in her right leg. (T. 227, 228).  According to plaintiff, she can only sit for twenty minutes in a chair

before she experiences extreme pain and cramping in her back and hips. (T. 229). Plaintiff takes pain medications which help her "regulate" her pain. (T. 230). These pain medications include an anti-depressant and morphine sulphate, which she takes two or three times a day. (T. 231). At night, the pain wakes her, and she has difficulty getting back to sleep. (T. 232). As a result, plaintiff stated that she is very sleepy, and takes frequent naps each day. (T. 233).

Plaintiff lives in a two-story apartment, and stated she has a lot of difficulty going up and down stairs. (T. 234). Plaintiff relies on her son and mother to assist her in preparing food because she is unable to get out of bed once or twice each week. (T. 235). On those days, she cannot move her leg, cannot bend, and cannot move from her bed. *Id*. According to plaintiff, physical therapy made her pain worse. (T. 236). Initially, the spinal injections helped reduce her pain, but the relief lasted only four or five weeks. (T. 237). Plaintiff testified that her son does the vacuuming and sweeping, but that she is able to prepare easy meals by taking breaks and avoiding bending. (T. 238). Plaintiff's son and mother also help with grocery shopping and lifting and carrying packages. (T. 239-40).

James Earhart, a vocational expert ("VE") testified at the hearing. (T. 240-48). First, the VE described plaintiff's prior work history, based on a comparison to the Dictionary of Occupational Titles. (T. 241). The VE stated that all of plaintiff's prior work was in the semi-skilled, light work category. (T. 241). The ALJ then asked the VE hypothetical questions, based on plaintiff's particular limitations. (T. 241-42). The ALJ's first hypothetical assumed that plaintiff could not perform her prior work,

but assumed that plaintiff could lift ten pounds occasionally, ten pounds frequently, stand and/or walk for two hours, and sit for a total of six hours in an eight hour work day with an option to sit or stand. (T. 241).  The hypothetical also included restrictions on pushing, pulling, and climbing stairs. (T. 241-42).

The VE testified that, taking into account the assumptions in the ALJ's hypothetical question, plaintiff would be able to work as a cashier in a cafeteria or parking lot, which would be classified as unskilled, sedentary work. (T. 242).  In response to a second hypothetical question, the VE stated that if an individual could not perform sedentary work and had lapses of concentration, that individual would not be able to perform a cashier's job or any other jobs. (T. 243).  Plaintiff's counsel added one or two additional restrictions to the ALJ's hypothetical, including the need to lie down three times each day for ten to fifteen minutes with a heating pad.  (T. 245).  The VE testified that very few jobs, if any, would be available with those restrictions.  (T. 245).

**B.  Medical Evidence**

**1. Dr. Craig Goldberg - Treating Neurosurgeon**

The record contains reports from Dr. Goldberg between November 19, 2002 and April 1, 2003.  (T. 125-34).  When Dr. Goldberg initially examined plaintiff on November 19, 2002, plaintiff complained that physical therapy did not improve her condition, and that she needed to frequently change positions because of her constant discomfort. (T. 129-31).  Dr. Goldberg performed surgery on plaintiff's lower back on November 27, 2002. (T. 132-34).  The surgery consisted of a hemilaminotomy

with foraminothomy and discectomy. (T. 132).  Plaintiff had several follow up

appointments with Dr. Goldberg after the surgery.  (T. 125-28).  Dr. Goldberg

examined plaintiff ten days, two weeks, six weeks, and two months after her surgery.

(T. 128, 127, 126, 125).  On December 6, 2002, plaintiff reported that she had

"excellent relief" of her radiating right leg pain.  Several days later, plaintiff reported

almost "complete resolution" of her right leg pain and the radiating symptoms. (T.

127).  Plaintiff was still reporting some soreness, discomfort, and numbness, which

Dr. Goldberg expected to improve.  Plaintiff was walking without a limp. (T. 127).

On January 3, 2003, plaintiff told Dr. Goldberg that she was quite pleased with the

surgical outcome, and was "ready to return to work." (T. 126).  Dr. Goldberg found

that it was time for plaintiff to return to work with the restriction of no heavy lifting

and no bending.  (T. 126).  On April 1, 2003, Dr. Goldberg reported that plaintiff told

him that her right lower leg pain and associated symptoms were gone, and that she

had returned to work.  Plaintiff reported occasional back discomfort, which was

reduced by taking Naprosyn. (T. 125).

## 2. Dr. Virgilio C. Victoriano - Board Certified Orthopedic Surgeon

Plaintiff was first examined by Dr. Victoriano on June 27, 2003. (T. 153).  She

told Dr. Victoriano that she had constant pain in her lower back and sacroiliac joint,

and had pain radiating to her legs. (T. 153).  Dr. Victoriano found decreased muscle

tone in plaintiff's lumbo-sacral back with pain on flexion beyond thirty degrees,

extension of ten degrees, and lateral flexion of twenty degrees. (T. 153).  He found

diffuse tenderness at L4-5, especially over the sacroiliac joint areas.  Dr. Victoriano

planned conservative treatment including medications, a repeat MRI, physical therapy, and a referral to a neurologist.  (T. 154).

Plaintiff returned to Dr. Victoriano on July 11, 2003, and he reviewed the "repeat" MRI that was taken on July 2, 2003. (T. 152).  Dr. Victoriano stated that the MRI was significant in finding "no disc protrusion and pressure into the spinal cord or nerve.  She does have some bulging discs but these are away from her spinal cord and nerve roots." (T. 152).  The MRI showed the laminectomy performed by Dr. Goldberg. *Id*.  Dr. Victoriano's report states that he explained the concept of back rehabilitation to the plaintiff and gave her a note for the physical therapist to "guide" the rehabilitation.  He told plaintiff that she should practice better posture and have patience with "rehab."  (T. 152).  Dr. Victoriano specifically stated that he counseled plaintiff about job retraining, especially for jobs that did not require a lot of standing, pushing, pulling, or lifting.  (T. 152).  Dr. Victoriano suggested that plaintiff contact a job counselor at a local community college so that she would be ready for the Fall semester. (T. 152).

Plaintiff's next visit with Dr. Victoriano was on July 23, 2003. (T. 151).  Plaintiff complained of increased pain after physical therapy. (T. 151).  Dr. Victoriano found that plaintiff had some difficulty walking on her heels and toes because of muscle weakness, but otherwise walked "fair to good." (T. 151).  When he tested plaintiff neurologically, Dr. Victoriano found no evidence of nerve disturbances, good reflexes, good muscle strength for knee extensions, no straight leg raising pain, and good dorsi-flexion of her feet.  (T. 151).  Dr. Victoriano stated

that since plaintiff's operation more than six months ago, she "really has not done much in any way of increasing her flexibility, muscle tone, muscle strength, and endurance." (T. 151).  He advised plaintiff that she must do her exercises several times each day.  He found that plaintiff could not tolerate sustained exercise because of her poor muscle tone.  He continued plaintiff's physical therapy.  (T. 151).

Plaintiff returned to Dr. Victoriano on August 15, 2003 and reported less discomfort. (T. 150).  He found that plaintiff had more flexibility in her lumbosacral spine, and she was able to walk on her heels and toes without any difficulty.  (T. 150).  He found that plaintiff's reflexes were getting "more brisk" and her leg strength was getting better. *Id*.  He found that plaintiff still had significant loss of muscle tone in her back and flank muscles, and had persistent tenderness over the L4-5, L5-S1, and S-I joint. (T. 150).  Dr. Victoriano continued plaintiff's conservative treatment, and again discussed retraining, with a specific recommendation that she participate in a VESID[1] program at the local community college.  His diagnosis was that she had "RESOLVING BACK PAIN SECONDARY TO DISC SURGERY L4-5."  He recommended that she enroll in a gym to increase her muscle strength. (T. 150).

Plaintiff returned to Dr. Victoriano on September 19 and October 20, 2003. (T. 149, 148).  During the September visit, plaintiff continued to report back pain, mainly "on extension." (T .149).  She complained of pain which traveled from her mid-back down her right leg, but Dr. Victoriano did not find any neurological

---

[1] VESID stands for "Vocational/Educational Services for Individuals with Disabilities."

8

support for this complaint. *Id.*  Dr. Victoriano took X-rays which showed no evidence of acute fracture or dislocation, but did show a diminished L5/S1 intervertebral disc space. (T. 149).  During the October examination, plaintiff complained of numbness and weakness, and Dr. Victoriano strongly recommended that plaintiff increase her activity level and again encouraged her to "start getting retraining." (T. 148).

### 3.  Dr. Ike Boka - Pain Management Consulation

On December 8, 2003, plaintiff was examined by Dr. Ike Boka, a pain management specialist.[2]  (T. 156-58).  Plaintiff was complaining of constant low back pain which was radiating to her legs, mainly her right leg.  (T. 156).  Dr. Boka took an extensive medical history and made detailed findings on a physical examination.  (T. 156-58).  Dr. Boka found that plaintiff had tenderness in her back, and found some restriction of flexion.  He found that plaintiff's muscle tone was good, and she had muscle strength of 5/5 in her extremities. (T. 157).  He found that plaintiff had a post-laminectomy syndrome, including lumbar radiculopathy with facet disease and sacroiliitis. (T. 158).  Dr. Boka believed that steroid injections, including radio frequency treatment would assist plaintiff.  Dr. Boka reported that plaintiff was taking Ultram and Tylenol.  (T. 157).

### 4.  Dr. Amelita Balagtas - Independent Medical Examination

On March 8, 2004, Dr. Balagtas examined all portions of plaintiff's spine. (T. 159-61).  Dr. Balagtas found full range of motion in plaintiff's cervical spine and

---

[2] Dr. Boka only examined plaintiff once.

upper extremities with full strength in plaintiff's upper extremity muscles. (T. 160).
Dr. Balagtas found no SI joint or sciatic notch tenderness and found that straight leg
raising was limited by low back pain to 40 degrees on the right side and 50 degrees
on the left. (T. 160). She found that plaintiff's reflexes in her lower extremities were
equal, and that her strength was 4.5 on a scale of 5 in the proximal and distal muscles
of plaintiff's right leg.  Her prognosis was "guarded" and her impression was that
plaintiff had low back pain, status post-discectomy. (T. 161).

### 5.  Dr. Richard Shelsky - Albany Center Pain Management

Between May 2004 and October 2004, plaintiff was treated many times by Dr.
Richard Shelsky of the Albany Center for Pain Management.  (T. 168-82).  Plaintiff's
initial visit to Dr. Shelsky was on May 19, 2004 when plaintiff complained of
constant sore aching in her back, with pain of 7 on a scale of 10. (T. 182).  Plaintiff
reported that she was able to do activities of daily living, but had to pace herself on
any arduous tasks. (T. 180).  Dr. Shelsky examined the July 2, 2003 MRI of
plaintiff's lumbar spine and found it to be

> significant for status post laminectomy at L5-S1 with mild disc bulging
> centrally.  There is no evidence of current disc herniation or significant
> epidural fibrosis.  There is also a small left paracentral disc herniation
> seen at L4-L5, this produces no significant mass effect and no
> significant enhancement with IV contrast.

(T. 181).

Dr. Shelsky found normal lumbar lordosis, flexion to approximately sixty
degrees before complaints of pain, and full range of motion when plaintiff bent
laterally.  He found that plaintiff was tender to the lightest palpation over her lumbar

paraspinal area and several other areas.  He found negative straight leg raising tests. (T. 182).  Dr. Shelsky's impression was that plaintiff had "low back pain with symptoms of bilateral lower extremity radicular pain, lumbar post laminectomy syndrome, but really no enhancing scar on MRI, lumbar degenerative disc disease at L4-L5." (T. 182).  His plan was to treat her with medication and possibly steroid injections. (T. 182).

On May 25, 2004, and on June 7, 2004, Dr. Shelsky administered steroid injections into plaintiff's spine. (T. 178-79).  One was a caudal epidural steroid injection, (T. 179), and the other was a transforaminal injection, (T. 178).  During a visit on June 24, 2004, Dr. Shelsky noted that the caudal epidural injection did not provide plaintiff with significant relief, but the transforaminal injection helped her right lower extremity pain "amazingly."  (T. 176).  Plaintiff was still complaining of right-sided low back pain, and Dr. Shelsky suggested "lumbar facet medial branch blocks." (T. 177).

On July 6, 2004, Dr. Shelsky administered a lumbar facet medial branch nerve block. (T. 175).  According to plaintiff, the nerve block "really has helped her right infragluteal pain, posterior thigh pain, 35-40 %, so she was a little bit more ambulatory." (T. 173).  Plaintiff complained to Dr. Shelsky that she still had intermittent numbness and weakness in her lower right leg, and had difficulty sleeping. (T. 173).  Dr. Shelsky's July 29, 2004 report states that plaintiff complained that "the longer she walks, the more pain she gets, but there is no evidence of this on her MRI." (T. 173).  He also stated that plaintiff is able to do her "activities of daily

living."  *Id*.

Plaintiff returned on August 27, 2004, and stated that she felt she received about "50 - 60 % pain relief and would like to try another procedure known as 'radiofrequency neurotomy'" on her right side. (T. 171).  On examination, Dr. Shelsky found tenderness to palpation in plaintiff's right lumbar paraspinal region, and another area of her back.  He found negative straight leg raising tests, and scheduled her for the radio frequency neurotomy.  On September 29, 2004, Dr. Shelsky performed lumbar radio frequency lesioning.  Plaintiff returned to Dr. Shelsky on October 7, 2004, and stated that after the radio frequency procedure, she had "good days" and bad days.  (T. 168).  Plaintiff told Dr. Shelsky that the day before the October 7, 2004 examination, she had "unremitting back and bilateral lower extremity pain." *Id*.  Dr. Shelsky commented that he could not explain the causation of that pain based on recent procedures, or based on the MRI.  He concluded that he was going to refer plaintiff for a neurologic consultation, and nerve conduction studies of her right leg.  (T. 169).

## C.   **Additional Medical Evidence**

After the ALJ's decision, plaintiff's counsel submitted additional medical evidence, with his May 31, 2005 brief to the Appeals Council.  (T. 193-217).  This evidence consisted of reports from Dr. Andrew Alpart, a family physician (T. 196-201), Dr. Bruce Beesley, a neurosurgeon (T. 203-12), results of nerve conduction studies (T. 208-12), a January 26, 2005 MRI (T. 206), and a questionnaire completed by plaintiff for Dr. Jonathan Cooper (T. 214-17).

It appears that Dr. Alpart treated plaintiff once or twice in March 2004, and the record contains his note, saying that plaintiff "remains completely unable to work." (T. 196).  However, the note does not contain any description of Dr. Alpart's treatment, or any reasons for his opinion. (T. 196).  On March 15, 2005, Dr. Alpart completed a disability form in which no description was given of plaintiff's treatment history.  Dr. Alpart concluded that plaintiff was totally disabled.  (T. 197-98).

Dr. Bruce Beesley from the Upstate Neurological Consultants treated plaintiff between December 20, 2004 and March 23, 2005.  (T. 203-12).  During the December 20, 2004 examination, Dr. Beesley found pain on palpation of plaintiff's paraspinal muscles in her lumbar spine, and marked pain in plaintiff's sacroiliac joint.  His impression was that plaintiff had chronic lower back pain after a laminectomy.  He believed that plaintiff's pain was a combination of mechanical problems and muscle spasms. (T. 213).  Dr. Beesley planned to do a nerve conduction study, and recommended that plaintiff continue taking Neurontin.  On January 19, 2005, Dr. Beesley performed the nerve conduction study and concluded that this was an "abnormal study," showing "significant acute denervation in the right lumbar paraspinals, with no clear acute denervation distally . . . , suggestive of ongoing but mild acute radicular irritation."  (T. 209).

On March 23, 2005, plaintiff returned to Dr. Beesley complaining of low back pain and headaches.  He found no significant complaint of pain when plaintiff was tested in a seated, distracted straight leg raising test. (T. 203).  Dr. Beesley's

impression was that plaintiff has chronic low back pain with some very mild radicular irritation. (T. 203). He recommended that plaintiff start a new medication, engage in more aggressive rehabilitation, and return for further consultation with pain management specialists. (T. 204).

The final document submitted by plaintiff to the Appeals Council is a pain questionnaire which plaintiff completed for Dr. Jonathan Cooper, a specialist in physical medicine and rehabilitation. (T. 214-17). In that questionnaire, plaintiff notes that she has pain on a range between three and five out of a ten point maximum, and that all activities make her pain worse, except when she uses heat, ice, or moves into a reclining position. (T. 214-17). This document is only plaintiff's own assessment of her pain. There is no report or statement by Dr. Cooper.

## DISCUSSION

### 1.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that [s]he is not only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area
> in which [s]he lives, or whether a specific job vacancy exists for [her],

14

or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; ... . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 2.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence

supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative

16

record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

**3.     Listed Impairment**

As stated above, a plaintiff is automatically entitled to benefits if his or her impairment meets or equals the requirements set forth in Appendix 1 of the Social Security Regulations. (The Listings). 20 C.F.R. §§ 404.1520(d); 416.920(d). Plaintiff's first argument is that the ALJ erred in finding that plaintiff's impairment does not meet or equal the severity of the impairments in "Listing 12.01." Plaintiff's Brief at 13. The Listing of Impairments appears in Appendix 1 of the Social Security Regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The court must first point out that plaintiff has mis-cited the relevant Listed Impairment. The impairments listed in 12.00 are "Mental Disorders" and the specific listed impairments begin with 12.02 (Organic Mental Disorders). Plaintiff in this case has no mental impairment, and thus, this citation is incorrect.

The relevant listing is section 1.04, referring to disorders of the spine. 20 C.F.R. Pt. 404, Subpt. P, § 1.04. The ALJ in this case stated that although the plaintiff had severe disorders of the spine, the requirements of Listing 1.04 are not met by the medical evidence because, among other things, "there is no evidence of nerve root compression and the claimant is able to ambulate effectively." (T. 17).

Listing 1.04(A) provides as follows:

1.04 Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including cauda equina) or the spinal cord. With:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

. . . .

There are two other sub-sections in Listing 1.04(A), however, they are not relevant to plaintiff's impairments because they require either spinal arachnoiditis or lumbar spinal stenosis, and plaintiff does not claim that she has either one of those impairments. *Id.* § 1.04(B) and (C).  The plaintiff argues that her impairments meet or equal listing severity because she has "degenerative disc disease, status- post laminectomy, and radicular symptoms in her lower extremities." Plaintiff's Brief at 13.

In order to meet the severity of a Listed Impairment, plaintiff must meet **all** the specified medical criteria. *Sullivan v. Zebley*, 439 U.S. 521, 530 (1990).  In *Zebley*, the court stated that an impairment manifesting only some of the criteria does **not** qualify. *Id.*  Additionally, for a plaintiff to show that her "unlisted" impairment is equal in severity to a listed impairment, she must present medical findings "equal in severity to **all** the criteria for the one most similar listed impairment." *Brown v. Apfel*, 174 F.3d 59, 64 (2d Cir. 1999)(quoting *Sullivan v. Zebley*, 493 U.S. at 531).

Other than making a general statement, plaintiff in this case does not specify

how her medical findings meet the specific criteria of a listed impairment or how her
"unlisted" impairment presents medical findings that are equal in severity to all of
the listed criteria.  It is clear that in order for plaintiff's impairment to meet the
criteria of a listed impairment, there must be evidence of the "compromise of a nerve
root or the spinal cord."  She must also exhibit nerve root compression, motor loss,
muscle weakness, and sensory or reflex loss.

The record contains substantial evidence supporting the ALJ's finding that
plaintiff does not meet the criteria of a listed impairment.  The MRI done on July 2,
2003 was "significant" in that there was no disc protrusion, and although plaintiff
had some bulging discs, they were "away from her spinal cord and nerve roots." (T.
152).  On July 23, 2003, Dr. Victoriano found no evidence of nerve disturbances,
good reflexes, good muscle strength for knee extensions, and no straight leg raising
pain. (T. 151).  In 2004, Dr. Shelsky examined plaintiff and reviewed the July 2,
2003 MRI. (T. 181).  Dr. Shelsky stated that plaintiff was status-post laminectomy
with "mild disc bulging centrally." (T. 181).  Dr. Shelsky found no evidence of
current disc herniation or significant epidural fibrosis.  In May of 2004, Dr. Shelsky
found that plaintiff had "low back pain with symptoms of bilateral lower extremity
radicular pain. (T. 182).  Plaintiff had good range of motion and could bend laterally
without pain. (T. 182).  Straight leg raising was negative, her motor strength was +5
bilaterally, and sensation was grossly intact to pinprick. (T. 182).  In March of 2005,
Dr. Beesley found that plaintiff had chronic low back pain with some "very mild
radicular irritation." (T. 203).

There is no evidence that plaintiff has nerve root compression or that there is any compromise of nerve roots or of the spinal cord.  In 2004, Dr. Shelsky found negative straight leg raising, (T. 172), on March 23, 2005,[3] Dr. Shelsky found no significant complaint of pain when plaintiff was tested in a seated, distracted straight leg raising test. (T. 203).  In December of 2003, Dr. Boka found that plaintiff's muscle tone was good, and that she had muscle strength of 5/5 in her extremities. (T. 157).  Dr. Balagtas found that plaintiff's reflexes were equal in her lower extremities and that her strength was 4.5 on a scale of 5 in the proximal and distal muscles of her right leg. (T. 161).

Although Dr. Balagtas also found some pain on straight leg raising tests in March of 2004, Dr. Shelsky found negative straight leg raising test bilaterally on August 27, 2004. (T. 160, 172).  Conflicts in evidence, however, are for the Commissioner to resolve. *Galiotti v. Astrue*, No. 06-5913, 2008 U.S. App. LEXIS 4050, *2 (2d Cir. Feb. 25, 2008)(citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)).  When as in this case, there are conflicts in the medical evidence, it is the fact-finder's decision that controls. *Id.*  Where the Commissioner's decision "rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner." *Id.* (citing *Veino v. Barnhart*, 312 F.3d at 586).  Although plaintiff in this case has some of the symptoms associated with a listed impairment, the ALJ's finding that plaintiff did not have a listed impairment is supported by substantial evidence.

---

[3] This report was after the ALJ's decision.

## 4.    Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at \*5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at \*5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...."  20 C.F.R. § 404.1529(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location,

21

duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

The ALJ's finding about plaintiff's credibility is supported by substantial evidence in the record. The ALJ refers to specific findings by Dr. Goldberg (T. 17) and Dr. Victoriano (T. 18). Both those physicians found that plaintiff had improved considerably and suggested or directly stated that she could return to work doing work other than a bartender. In September of 2003, Dr. Victoriano specifically stated that plaintiff's mid-back pain and right leg pain were not supported by the intact neurological examination. (T. 149). On August 15, 2003, Dr. Victoriano noted that plaintiff had lost muscle tone in her back and flank muscles, however, his suggestion was to continue plaintiff's physical therapy to strengthen her muscles and increase her flexibility. (T. 150).

The record does not contain any statements by plaintiff to her treating physicians which are comparable to plaintiff's complaints to the ALJ during the hearing. The ALJ pointed to plaintiff's use of a cane,[4] the requirement for which is not supported by any medical opinion. (T. 20). The ALJ stated that Dr. Victoriano's

---

[4] On June 24, 2004, Dr. Shelsky stated that although plaintiff walked with a cane, he was not 100% sure of the reason, and plaintiff had no visible deformity, clubbing, cyanosis or atrophy. (T. 176). On August 27, 2004, Dr. Shelsky again appeared to doubt the necessity for plaintiff's use of the cane. (T. 172).

notes do not state that he advised plaintiff to use a cane,[5] rather, he suggested she join a gym. (T. 20, 150).  The ALJ also made numerous references to plaintiff's ability to perform activities of daily living. (T. 20).  Perhaps most significant is the fact that nowhere in the medical reports is any reference by plaintiff or any physician to her claim that she must recline 75 to 80% of each day to relieve her pain.

The court would also point out that the evidence submitted to the Appeals Council contains reports that support the ALJ's finding.  Notwithstanding an "abnormal" nerve conduction study performed on January 19, 2005, Dr. Beesley stated on March 23, 2005 that plaintiff was suffering from "chronic lower back pain" with "some *very mild* radicular irritation," and there was no fixed weakness, numbness, or radicular injury on examination. (T. 203, 208-209)(emphasis added). On March 23, 2005, Dr. Beesley stated that plaintiff would benefit from "more aggressive rehabilitation." (T. 204).  The ALJ's finding regarding plaintiff's credibility is fully supported by substantial evidence in the record.

## 5.   **Residual Functional Capacity (RFC)**

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y.

---

[5] The court notes that the only doctor who appears to have suggested that plaintiff "consider" an assistive device is Dr. Boka, who only examined plaintiff once on December 8, 2003. (T. 158).  When plaintiff was examined by Dr. Balagtas on March 8, 2004, the report states that plaintiff did "not use any assistive device." (T. 160).  Dr. Balagtas further noted that plaintiff did not need help changing for the examination and did not need help getting on and off the examination table. (T. 160).

1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and ***may not simply make conclusory statements regarding a plaintiff's capacities***. *Verginio v. Apfel*, 97-CV-456, 1998 U.S. Dist. LEXIS 16815, *9-10 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.  Physical abilities are determined by evaluating exertional and non-exertional limitations in performing a certain category of work activity on a ***regular and continuing*** basis. *Id.* (citing 20 C.F.R. § 404.1567, 404.1569a, 416.967, 416.969a).

The Social Security regulations classify jobs in the national economy by their physical exertion requirements. 20 C.F.R. § 404.1567, 416.967.  The categories have the same meaning as they have in the Dictionary of Occupational Titles published by the Department of Labor. *Id.*  These categories are sedentary, light, medium, heavy, and very heavy. *Id.*  Sedentary work requires the ability to lift no more than ten pounds, to sit for extended periods of time, and the ability to stand and walk occasionally. *Id.* §§ 404.1567(a), 416.967(a).  The regulations themselves do not fix a period of time that one must be able to sit in order to perform sedentary work, but the Social Security Rulings (SSR) indicate that the individual must be able to sit for at least six hours, with routine breaks.[6] SSR 96-9p,[7] 1996 SSR LEXIS 6 (July 2,

---

[6] "Routine" breaks include a morning break, a lunch period, and an afternoon break at approximately two hour intervals.

[7] This ruling is entitled "Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work.  The purpose of this Ruling was to explain the agency's policy regarding the impact of an individual's inability to perform a full range of sedentary work and explains the basic requirements of sedentary work while discussing individuals who cannot perform the full range of sedentary work. SSR 96-9p,

24

1996).  Sedentary work does ***not***, however, require an individual to "sit without moving for six hours." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

The ruling also states that "occasionally" means occurring from "very little up to one third of the time, and would generally total no more than about 2 hours of an 8-hour workday." SSR 96-9p, 1996 SSR LEXIS 6 at *8-9.  Thus, for sedentary work, the ability to stand and walk "occasionally would mean for ***no more than*** a total of two hours in an eight-hour workday, and would not require standing and walking continuously for those two hours.  Sedentary work also requires the "nonexertional" capacities for seeing, manipulation, understanding, remembering, and carrying out simple instructions. *Id.* at *9.

"Light work" requires the ability to lift no more than twenty pounds, with lifting or carrying up to ten pounds frequently. 20 C.F.R. §§ 404.1567(b), 416.967(b).  A job falls into the light work category when it involves a "good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

The Regulations also contain "Medical Vocational Guidelines." 20 C.F.R. Pt. 404, Subpt. P, App. 2.  These guidelines are divided into sections representing each exertional category of work from sedentary to very heavy.  Each section contains a table, listing "age," "education," and "previous work experience."  Based on the three variables, the table also indicates whether the individual is "disabled" or "not disabled."  The existence of jobs in the national economy is reflected in these tables,

---

1996 SSR LEXIS 6, *8-9.

known as the "Grids.". *Id.* App. 2, § 200.00(b). In promulgating these rules, the agency has taken administrative notice of the numbers of unskilled jobs that exist at the various functional levels as supported by the Dictionary of Occupational Titles and other vocational references. *Id.*

When an individual's impairments and related symptoms are purely exertional and the individual's vocational profile is listed on the table, then the "Grid" is applied directly to determine whether the individual is disabled or not disabled. 20 C.F.R.   §§ 404.1569a(b), 416.969a(b). It has been held that if properly applied, the result expressed in the "Grid" will fulfill the Commissioner's burden at step five of the disability evaluation, without obtaining further inquiry of a vocational expert. *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)).

However, when a claimant is not capable of the full range of a particular exertional category of work, such as when combined exertional and nonexertional limitations exist, the "Grid" may only provide a "framework" for decision. *See Bapp v. Bowen*, 802 F.2d at 603, 605-606. Before the nonexertional impairment or impairments will invalidate the presumptions created by the grid, those impairments must "significantly diminish" the range of work allowed by the individual's exertional capabilities. *Blanda v. Astrue*, 05-CV-5723, 2008 U.S. Dist. LEXIS 45319, *45-47 (E.D.N.Y. June 9, 2008)(citations omitted).

If the non-exertional impairment or impairments do significantly diminish the individual's ability to perform a full range of the exertional category of work, then

the ALJ may use a VE to satisfy the Commissioner's burden to show that the claimant can perform substantial gainful work at step five of the disability analysis. *Id.* at *46-47 (citing *Davis v. Massanari*, 00 Civ. 4330, 2001 U.S. Dist. LEXIS 19747 (S.D.N.Y. Nov. 29, 2001)).

Plaintiff in this case argues that the ALJ erred in finding that plaintiff could do "light work". Plaintiff's Brief at 16-17.  Plaintiff bases this argument upon the ALJ's improper rejection of her subjective complaints, together with the medical evidence of record.  However, the ALJ in this case found that plaintiff was restricted to "sedentary" work, not "light work." (T. 20).  In fact, although the ALJ noted that the agency reviewer rated plaintiff's RFC as "light," the ALJ stated that he was making a "further allowance" for plaintiff's complaints of pain by finding that her RFC was for "sedentary work." *Id.*

The ALJ went further by obtaining the testimony of a VE to determine whether an individual with plaintiff's particular or additional restrictions would still be able to perform substantial gainful sedentary work in the national economy.  The court would first note that although the Commissioner has the burden at step five to show that the plaintiff can perform alternative work in the national economy, based upon her RFC, the finding of RFC is performed at step four of the evaluation, where plaintiff has the burden of showing that she cannot perform her prior work. 20 C.F.R. §§ 404.1512(c), 404.1520(g), 404.1545(a)(3) and (a)(5), 404.1560(c).[8] It is clear the plaintiff's burden of proof includes providing evidence that will be used by the

---

[8] The matching regulations for SSI are 20 C.F.R. §§ 416.912(c), 416.920(g), 416.945(a)(3) and (a)(5), and 416.960(c).

Commissioner in determining plaintiff's RFC during the first four steps of the analysis. *Id*. Even though plaintiff's counsel has mis-cited the ALJ's finding, the court will still review the RFC determination for substantial evidence.

The ALJ based his findings upon the doctor's reports, indicating that plaintiff did retain some abilities. Dr. Victoriano suggested that plaintiff get "retraining," in order to perform another job that would not require a great deal of standing, pushing, pulling, or lifting. (T. 152). Later, he encouraged plaintiff to perform her exercises, and was concerned that her inability to perform heel/toe walking was due to muscle weakness, not due to her impairment. (T. 151). At each examination, Dr. Victoriano emphasized that plaintiff should be attempting to strengthen her back and continue to do her exercises. (T. 148, 149, 150, 151, 152). Dr. Balagtas stated that plaintiff would have "some" limitations in activities that required bending, lifting, prolonged sitting, and prolonged standing and walking." (T. 161).

Although the ALJ found that plaintiff could *generally* perform sedentary work, he called a VE to testify, and in the ALJ's hypothetical question, he further limited the amount of sedentary work that the plaintiff could perform. (T. 241). Thus, the ALJ assumed that plaintiff could *not* perform the "full range" of sedentary work. When the ALJ asked the hypothetical question, he stated that the plaintiff could lift up to ten pounds frequently and stand and or walk for a "total" of two hours in an eight hour day. (T. 241). The ALJ also asked the VE to assume that plaintiff could sit for "a total of six hours," but that she needed "***the option to sit and or stand at***

*will*."[9]  Plaintiff would also be limited to pushing and or pulling "occasionally, and although she could occasionally climb stairs, she could never climb ladders or scaffolding. (T. 241-42).

The ALJ even assumed that plaintiff needed to use a cane, even though Dr. Shelsky doubted plaintiff's need to use the assistive device. (T. 242).  She would never be able to crouch or crawl, but could kneel and stoop occasionally. (T. 242). Plaintiff would have to avoid concentrated exposure to temperature extremes, wetness, humidity, vibration, hazardous machinery, and heights. *Id*.  Finally, the ALJ also asked the VE to assume that plaintiff could not perform complicated tasks, could only perform simple decision-making, and had occasional lapses in concentration. (T. 242).

In this hypothetical, it appears that the ALJ placed ***substantial*** limitations upon the plaintiff's ability to perform a full range of sedentary work, and the VE still testified that plaintiff could perform at least two jobs in the national economy with her particular limitations, ***most significantly*** the necessity to sit or stand at will.  The ALJ made many concessions in the hypothetical question for plaintiff's complaints of pain and limitations.  The ALJ did not doubt that plaintiff was in pain, he doubted that she had as severe limitations as she testified, particularly the necessity to lie down for most of the day.  As stated above, the ALJ's credibility determination is supported by substantial evidence.

Based upon the RFC for a limited amount of sedentary work, the ALJ

---

[9] This restriction would encompass plaintiff's inability to sit for "prolonged" periods of time as stated in Dr. Balagtas's report. (T. 161).

consulted a VE, who testified, based upon a proper hypothetical question, that plaintiff could perform at least two jobs existing in significant numbers in the national economy.  By obtaining the VE's testimony, the Commissioner fulfilled his burden at step five to show that plaintiff could perform substantial gainful activity. Thus, this court finds that the Commissioner's decision is supported by substantial evidence and should be affirmed.

WHEREFORE, based on the findings in the above Report, it is hereby

RECOMMENDED, that the Commissioner's decision be AFFIRMED and plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: July 21, 2008

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge